1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3    -----------------------------------

4    SHERWYIN ROCKE, individually and  :
     on behalf of all others similarly :
5    situated,
                                        : Civil Case Number:
6                 Plaintiff,            : 1:20-cv-11736-RWZ
                                        :
7            -against-                  :
                                        :
8    MONARCH RECOVERY MANAGEMENT,       :
     INC.,                              :
9                                       :
                  Defendant.            :
10   -----------------------------------

11

12

13

14

15        Videoconference Deposition of DIANE MAZZACANO,

16   taken remotely from Cinnaminson, New Jersey, on Friday,

17   September 10, 2021, commencing at 11:05 a.m., before

18   Jennifer Mann, a Shorthand Reporter and Notary Public.

19

20

21

22

23

24

25



DIANE MAZZACANO                                    September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

```
 1    APPEARANCES: (VIA ZOOM)

 2

 3         MARCUS & ZELMAN, LLC
           BY:  YITZCHAK ZELMAN, ESQUIRE
 4         701 Cookman Avenue
           Suite 300
 5         Asbury Park, New Jersey 07712
           Attorney for the Plaintiffs
 6         yzelman@marcuszelman.com
           (732) 695-3282
 7

 8         MARGOLIS EDELSTEIN
           BY:  RONALD M. METCHO, ESQUIRE
 9         220 Penn Avenue
           Suite 305
10         Scranton, Pennsylvania 18503
           Attorney for the Defendant
11         rmetcho@margolisedelstein.com
           (570)257-6510
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                     I N D E X

 2    WITNESS                 INTERROGATION BY         PAGE

 3    (VIA ZOOM) DIANE MAZZACANO

 4                      Mr. Zelman                     5

 5

 6

 7

 8                  E X H I B I T S

 9    EXHIBIT NUMBER          DESCRIPTION              PAGE

10

11    A          Collection Letter                    8

12    B          Special Account Handling Policy      18

13    C          Rocke Document Production            34

14

15

16

17

18

19

20

21

22

23

24

25
```



DIANE MAZZACANO                                    September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

```
 1                    LITIGATION SUPPORT INDEX

 2              Direction to Witness Not to Answer

 3     Page      Line              Page    Line          Page  Line

 4                              (NONE)

 5

 6

 7

 8

 9

                Request for Production of Documents
10
       Page      Line              Page    Line          Page  Line
11

12      29        6

13

14

15

16

17

18                           Stipulations
19
       Page      Line              Page    Line          Page  Line
20
        5         1
21

22

23

24

25
```



1                         (It is hereby stipulated and

2          agreed by and between counsel that the filing,

3          sealing, and certification are waived; and that

4          all objections, except as to the form of the

5          question, are reserved until the time of

6          trial.)

7                              - - -

8                         DIANE MAZZACANO, after having

9          been first duly sworn, was examined and

10         testified as follows:

11                             - - -

12                    DIRECT EXAMINATION

13                             - - -

14    BY MR. ZELMAN:

15         Q.   Good morning.  My name is Yitzchak Zelman.

16    I represent the plaintiff, Sherwyn Rocke, in this

17    matter.

18                         Can you please state your name

19    for the record?

20         A.   Diane Mazzacano.

21         Q.   Ms. Mazzacano, you understand that you're

22    testifying here today on behalf of Monarch Recovery

23    Management?

24         A.   Yes.

25         Q.   What is your role with that company?



1          A.    I'm the president.

2          Q.    How long have you been in that role for?

3          A.    I don't know why I don't remember this

4    right off the top of my head, but at least five

5    years.

6          Q.    Now, have you ever given a deposition

7    before?

8          A.    Yes, I have.

9          Q.    How many times?

10          A.    I don't know the exact number.  Many.

11          Q.    Okay.  So out of respect for your time,

12   I'm going to skip all the instructions that relate

13   to how a deposition proceeds and about speaking slow

14   and clear and all that stuff.  I'm pretty sure you

15   know those instructions at this point.

16                      The other thing I will say,

17   because often people get hung up on this is, at

18   times you may hear your counsel voice an objection.

19   You should let him finish his objection, and then

20   unless he specifically instructs you not to answer

21   the question, you should then proceed to answer the

22   question.  I always see people get hung up there and

23   not sure if they should answer or not.  So let's put

24   that out there.  Okay?

25          A.    Okay.



DIANE MAZZACANO                                    September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

1        Q.    Great.

2                        What did you review in

3     anticipation for today's deposition?

4        A.    I reviewed the answers -- not answers.  I

5     have this document here, Objections to Plaintiff's

6     First Set of Interrogatories.  I read over that

7     document, and I think -- I just looked over the

8     account again.  That's about it.

9        Q.    Okay.  You have some documents there in

10    front of you.  So I know what you have, can you

11    identify what documents you're referring to?  I know

12    you said you have the responses to the

13    interrogatories.  Anything else?

14       A.    I have just one, six-page document that is

15    Defendant Monarch's Answers and Objections to

16    Plaintiff's First Set of Interrogatories.  That's

17    all I printed out so far.

18       Q.    Okay.  Great.

19                        But the other documents, when I

20    need you to look at them, I'll just put them up on

21    the screen and we'll look at them together.

22       A.    Okay.

23       Q.    Other than speaking with your counsel, did

24    you talk to anyone in preparation for today's

25    deposition?



1        A.    No.

2        Q.    Okay.  Now, do you have a basic

3   understanding of what this lawsuit is about?

4        A.    Yes.

5        Q.    And, just generally, my client filed a

6   lawsuit under the Fair Debt Collection Practices Act

7   against Monarch Recovery, alleging that Monarch

8   included a requirement that any dispute has to be in

9   writing in the collection letter that they sent to

10  my client.

11                     Does that pretty much coincide

12  with your understanding of the case?

13       A.    Yes.

14       Q.    Great.

15                     So let's talk about that letter

16  for a quick moment.  To make this easier for you --

17  do you have a copy of the collection letter there?

18       A.    Not in front of me.  No.

19       Q.    That's fine.  We're going to mark this

20  Exhibit A.

21                     MR. ZELMAN:  Jen, I will send

22       you the exhibits after the deposition to be

23       included with the transcript.

24                     - - -

25                     (Exhibit A was marked for



1        identification.)

2                              - - -

3    BY MR. ZELMAN:

4        Q.   Ms. Mazzacano, if you can just take a look

5    at this document and tell me if you recognize it.

6        A.   Yes, I do.

7        Q.   Is there a name for this document, like a

8    template form or something that you guys use to

9    refer to this back at Monarch?

10       A.   Yes.  That is a T letter.

11       Q.   A T letter.  What is a T letter?

12       A.   It is the first notice that is sent to a

13   consumer.

14       Q.   When did Monarch start using this T

15   letter?

16       A.   I would have to look at my files.  That

17   particular letter in that form, those words, I don't

18   know the exact date.  But I can easily find the

19   exact date.  I don't have it in front of me.

20       Q.   Are we talking like a period of several

21   years ago?

22       A.   That form is a little bit newer.  I would

23   say a couple years.  Maybe two years that was in --

24   no.  No.  Actually, no.  That was just the way we

25   have our -- the whole letter situated in that exact



1  language, maybe a year -- maybe a year prior.  But I

2  would have to look it up.  I'm not really sure.

3      Q.   When you say "a year prior," this letter

4  is dated February 12th, 2020, so --

5      A.   2020, yeah.

6      Q.   A year prior to that date?

7      A.   I'm not sure.  Because we change the

8  format of our letters -- you know, with 2020 I'm

9  kind of losing track of if it was 2018 or 2019.  I

10 really -- it's easy to find.  I just can't answer

11 that question right now.

12     Q.   Sure.  Okay.  And it's something you can

13 find sitting here at your computer?  Or is that

14 something a little more complex than that?

15     A.   No.  I could find it if we took a break.

16 I would have to switch over to the other computer.

17     Q.   So let's --

18     A.   Yeah.

19     Q.   -- (distortion) for now.  If we take a

20 short break later today, which will probably happen,

21 you can do that.

22     A.   Okay.

23     Q.   Let me just note that.

24              So we're sitting here today in

25 September of 2021.  Is Monarch still using this T



1    letter in this format?

2         A.    No.  It looks a little different.

3         Q.    What changed?

4         A.    The format of it changed.  And it's

5    changing again now, you know, due to Regulation F

6    that's coming on soon.  So the letter definitely

7    will look completely different, and we're in the

8    middle of doing that.  So, you know, some

9    information is moved around.  The dispute language

10   is different, slightly different.  And, yeah, the

11   look and the feel of the letter is a little

12   different.

13        Q.    What's different about the dispute

14   language?

15        A.    We added some information, I believe --

16   oh.  You know what?  It's by state.  Some states

17   require the "in writing," like Massachusetts did at

18   the time, and I think they still do.  So it's really

19   by state.  It's more specific to the state.  Some

20   states don't require it in writing, so we took that

21   out.  And some states we left it more, you can do

22   verbally or in writing.  But I think we removed

23   that.  I think it's about the "in writing" part.

24   Again, Massachusetts requires it.  That's why it's

25   there.  Other states don't, or they don't like it to



1   be there, so it's going to go away or it went away.

2   Then when Reg F comes throughout the next few weeks,

3   you know, that will change again.  So we're just

4   trying to be compliant with each state and what they

5   require.

6        Q.   All right.  Just to clarify.  I'm going to

7   highlight it here.

8        A.   You don't need to.  It's the dispute

9   paragraph.

10       Q.   I'm just going to focus on this specific

11   sentence on the first one here.

12       A.   Okay.  Sure.

13       Q.   That's why.  To make this easier for

14   everyone.

15                  Where it says, Unless you notify

16   this office in writing within 30 days after

17   receiving this notice that you dispute the validity

18   of this debt, or any portion thereof, this office

19   will assume that this debt is valid.

20                  So sitting here today, September

21   of 2021, are you still including this sentence in T

22   letters sent to Massachusetts debtors?

23       A.   No, we are not.

24       Q.   But you said that Massachusetts requires

25   it to be in writing?



DIANE MAZZACANO                                   September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

```
 1        A.    Yes.   They do require it to be in writing.
 2   We -- for a time we changed this letter, and we
 3   included it to say "verbally or in writing," to just
 4   make it even more clear and to accommodate all
 5   consumers, you know, consumers who are unable to
 6   write us a letter.   Our policy has always been to
 7   accept verbal or in writing disputes.   But in our
 8   first notice, we had "in writing" for a while, and
 9   we've left it out, also, for a time period.   And
10   then we've added "verbally or in writing" and then
11   we have since removed that as well.
12        Q.    How does it read as of today?
13        A.    I'd have to pull a Massachusetts letter,
14   but I believe it says, Unless you notify this office
15   within 30 days.
16        Q.    So you just took out that "in writing"
17   words?
18        A.    We took it out, yeah.
19        Q.    Do you know when you did that?
20        A.    Again, that's an easy thing I can find
21   out.   I do have a time line for all of our letter
22   changes.   So if we can table that, I can give you
23   both dates.
24        Q.    Okay.   That's fine.   I'll note that down.
25   I can remind you later.
```



1               Now, you say that Massachusetts

2    requires disputes be in writing.  What are you

3    basing that on?

4         A.   Advice from my counsel and our compliance

5    department on the regulations for the states.

6         Q.   I can't ever ask you what you spoke about

7    with your counsel.  But are you aware of any of

8    those regulations that would require this to be in

9    writing?

10        A.   From my counsel, yes.

11        Q.   Okay.  Let me stop sharing for a moment.

12   All right.  Take that off the screen.

13               That is going to help me go to

14   my questions here.  In the interrogatories, which

15   you do have in front of you, your responses to the

16   interrogatories?

17        A.   Yes.

18        Q.   In Monarch's responses to our

19   interrogatories -- we asked a number of questions

20   about how many debtors got these letters.  And we

21   have some responses, but I wanted to clarify that I

22   have the answer I was looking for.  So if you can

23   turn to page 2.  Let me know when you're there.

24        A.   I'm there.

25        Q.   Okay.  If you look at the bottom of the



1   second page, Interrogatory 7 we ask, Identify how

2   many debtors with an address --

3                     MR. METCHO:  I'm sorry to

4        interrupt you.  Would you be able to pull these

5        up, so we're all looking at the same --

6                     MR. ZELMAN:  Oh, yeah.  Of

7        course.  I'm sorry.

8                     MR. METCHO:  Thank you.

9                     MR. ZELMAN:  I thought the

10       witness had it, but that's fine.  One moment.

11       Share screen.  All right.

12  BY MR. ZELMAN:

13       Q.   So, Ms. Mazzacano, if you look at the

14  screen in front of you, you'll see the bottom of 2,

15  Interrogatory 7 we asked, How many debtors with an

16  address in Massachusetts were mailed that initial

17  collection letter by the defendant, such as the

18  annexed Exhibit A, from September 23, 2019, to the

19  present, in an attempt to collect an obligation owed

20  to or allegedly owed to First Premier, which letter

21  stated, Unless you notify this office in writing

22  within 30 days after receiving this notice that you

23  dispute the validity of this debt, or any portion

24  thereof, this office will assume that this debt is

25  valid.



DIANE MAZZACANO                                      September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

```
1                        Do you see that?
2         A.   Yup.
3         Q.   So the answer was, Monarch sent 746
4    letters from October 23, 2019 to October 23, 2019 --
5    I'm sorry.  I read that wrong.
6         A.   That's a typo.
7                   MR. METCHO:  And that's my
8         fault.  When I was preparing with Diane, the
9         second "19" should read "20," obviously.  And I
10        will clean up the responses to reflect the
11        proper dates as well.  Okay?
12                  MR. ZELMAN:  That's fine.  I
13        wasn't even harping on the response.
14   BY MR. ZELMAN:
15        Q.   What I was more trying to make sure is, in
16   response to Interrogatory 7, just to be clear, did
17   Monarch send 746 T letters during this time period
18   of October 23, 2019 to October 23, 2020, to
19   Massachusetts debtors regarding First Premier
20   accounts?
21        A.    It wasn't just T letters.  There's another
22   letter.  It's a letter 1.  And the T letter and the
23   1 letter are the only two first notices.  So a No. 1
24   letter was also included in the 746 letters.
25        Q.   Okay.  So that's what I was trying to
```



1   clarify, to make sure I have the right number here.

2        A.   I went by that sentence -- you have a

3   problem with the sentence -- or I'm sorry, you

4   don't.  Maybe.  Somebody has a problem with the

5   sentence.  So I was -- you know, tied into that

6   sentence, so any letter that had that sentence that

7   went to Massachusetts.

8        Q.   That's fine.  And I have no issue with you

9   doing that.  I just wanted to check then.  What is

10  the difference between a T letter and a 1 letter?

11       A.   So if you go back to the T letter, you'll

12  notice that the T letter offers a settlement or a

13  discount above -- I think it was the -- one of the

14  paragraphs on there.  And the No. 1 letter looks

15  identical.  It just doesn't have that.  That type of

16  account didn't -- I'm trying to think.  Like, a

17  commercial account or something wouldn't have that

18  type of offer.  So it was -- yeah, a 1 letter just

19  doesn't have the settlement offer.

20       Q.   For all intents and purposes, other than

21  having a settlement offer or not having a settlement

22  offer, the T letter and the 1 letter are identical?

23       A.   Yes.

24       Q.   Okay.  And the 746 number that we have

25  here in response to Interrogatory 7 encompasses both



1  the T letters and the 1 letters, correct?

2        A.   Correct.

3        Q.   Great.

4                  And the same answer for your

5  responses to Interrogatories 8, 9, and 10?

6        A.   Yes.

7        Q.   Excellent.  Okay.  Great.  Take this down

8  for now.

9                  Now, let's see.  We have a

10 policy document here.  I'm trying to pull it up.

11 There we go.  Let me put it up on the screen.

12                 All right.  If you can take a

13 look at the screen, I put up a two-page document

14 entitled Special Account Handling Policy.

15                 Do you see that?

16       A.   Yes.

17       Q.   We'll mark this as Exhibit B.

18                      - - -

19                 (Exhibit B was marked for

20       identification.)

21                      - - -

22 BY MR. ZELMAN:

23       Q.   When was this document created?

24       A.   Many years ago.  It is reviewed each year.

25 And this is the most recent version, Version 21.0.



1    But that document has been in existence for many

2    years.

3          Q.   So when you say Version 21.0, every year

4    there's a new version?

5          A.   Yes.

6          Q.   Okay.  And this version, when did this

7    come into effect?

8          A.   This version has not changed, but it was

9    approved -- each year we approve our company

10   policies, and in January of 2021, that policy was

11   approved.  But it is identical to the last few

12   years' policies.  I don't think it's changed in

13   maybe two or three years.

14         Q.   Okay.  I see at the bottom here it says,

15   This is part of the 2021 Monarch Company Policy

16   Handbook?

17         A.   Correct.

18         Q.   Sitting here today, you're certain that

19   these policies were all the same in effect in 2019

20   and 2020?

21         A.   Yeah.  I can produce the 2019, if you'd

22   like, or 2020.

23         Q.   I just want to make sure we have the right

24   policy is all.

25         A.   Yeah.  That is the policy.



```
1         Q.   Okay.  All right.

2                   So in the middle of this first

3    page -- well, there's page numbers at the bottom of

4    this document, so I guess it would be page 224.

5         A.   Yes.

6         Q.   First it says this is a policy -- where it

7    says Monarch collection representatives receive

8    verbal communications from consumers via telephone

9    conversations or voice mail messages.  Do you see

10   that, right under where it says policy?  And then

11   lower down, where it says, General procedures by

12   category, verbal and written?

13        A.   Correct.

14        Q.   It says, Disputes, If the consumer

15   disputes the debt, the account is notated, updated

16   and placed in a protected hold status.  The account

17   is not worked again until the dispute is resolved.

18   The dispute is sent to the client and the account is

19   handled per client specifications.

20                   Do you see that?

21        A.   Correct.  Yes.

22        Q.   It is Monarch's policy that if a consumer

23   disputes a debt via a verbal dispute or a written

24   dispute, the dispute will be treated the same,

25   correct?
```



DIANE MAZZACANO                                          September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

1       A.    Correct.

2       Q.    Okay.  Well, if that's the case, then why

3   wouldn't you tell consumers that in your letters to

4   them instead of requiring that any dispute be in

5   writing?

6       A.    The dispute requirement for Massachusetts

7   at the time was that disputes had to be in writing.

8   So we tell the consumers in our letter what

9   Massachusetts requires.  If they call us, we, you

10  know, can just discuss how they can dispute the

11  debt.  But Massachusetts required it at the time to

12  be in writing, so that is what we tried to

13  communicate to the consumer.

14      Q.    Again, what are you basing your belief on

15  that this is what Massachusetts requires?

16      A.    The Massachusetts requirements, and I

17  receive that information, as we do with all of our

18  letters, through attorney communications and review

19  and compliance.  So in reviewing what Massachusetts

20  has put out there, what they want consumers -- or

21  sorry -- collection agencies to do.

22      Q.    Just to clarify, I don't know what your

23  processes are in terms of getting letters approved

24  or reviewed by counsel.  Are you referring -- when

25  you say that an attorney reviewed a letter, are you



DIANE MAZZACANO                          September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

1   saying -- is that Mr. Metcho or someone...
2          A.    We have internal general counsel.  But I
3   also consult with outside counsel as well.  We do
4   communications with both.  You know, this is a big
5   deal.  We receive, you know, a lot of scrutiny on
6   our letters, and, you know, they have to be correct.
7   So we try to follow the -- we don't try.  We follow
8   the state's guidelines, regulations, laws.  You
9   know, we don't want to -- we just want to make sure
10  that that state law is followed.
11         Q.    Can you point me to a single state law
12  which requires disputes in Massachusetts have to be
13  in writing?
14                      MR. METCHO:  I'm going to
15         object.  It's a question of law.
16                      You can answer, Diane, if you're
17         able.
18  BY MR. ZELMAN:
19         Q.    You can answer.
20         A.    No.  I would have to look back and see
21  where this originated from.  But that is our belief,
22  that Massachusetts requires it to be in writing.
23         Q.    I understand it's your belief.  I'm just
24  asking, what is your belief based on?  Obviously,
25  this is a big issue in this lawsuit.  This lawsuit



1   has been pending for over a year, so you must have

2   some sort of belief that is premised on something.

3   I'm asking, what is that something based on?

4                        MR. METCHO:  I'll object to the

5        question on the grounds that it may seek

6        information that is protected by the

7        attorney-client privilege.

8                        But, Diane, you can answer, if

9        you're able.

10                        THE WITNESS:  I -- I can only

11        say that that was our understanding, that the

12        law required it to be in writing.  That's all I

13        can say, is that was our understanding.  And I

14        still believe that, that that is true.

15   BY MR. ZELMAN:

16        Q.   Okay.  I just looked out the window.  I

17   see that it's sunny outside, so I have a belief that

18   the sky is blue.  You have a belief that the law in

19   Massachusetts is that disputes must be in writing.

20   So the question is, what is that belief premised on?

21   Is it solely, counsel told me this, therefore, I

22   believe it, or do you have some other basis for

23   saying that?

24        A.   This has been -- this language was on our

25   Massachusetts letters for many, many years.  This is



1  the first lawsuit that we have received, I think in

2  a five-year -- I didn't go back that far.  I think I

3  went back four years, actually.  But I believe it

4  probably goes back even further.  And we have never

5  received a lawsuit in Massachusetts questioning this

6  language.  So it goes back many years.  And each

7  year when we reviewed it, you know, we looked at

8  the, you know, the different loss -- you know, the

9  activity in the courts and the activity -- you know,

10  we're not just looking at one specific place.  You

11  know, we're looking across our industry.

12                    But I can't tell you exactly the

13  statute or the -- you know, I'm not sure what you're

14  looking for.  But you believe that it's not

15  required.  But this is the only lawsuit we've

16  received and we -- our research each year when we

17  look at our letters and decide on that dispute

18  language for Massachusetts, I can't -- like, again,

19  I can't tell you the exact -- you know, pinpoint the

20  exact document that we were using.  But we did our

21  research, and it was overall in the industry,

22  Massachusetts was that language.  They required it

23  to be in writing.

24                    You know, and, again, if we want

25  to go back to -- it's not something I could do



1   today, but we can go back -- I can go back and give

2   you a more specific answer.  You know, maybe case

3   law or decisions or the regulations from the State

4   of Massachusetts themselves.  You know, we can do

5   that, for sure.

6                   But sitting here today at this

7   moment, all I can tell you is that we did our

8   research, and it was our belief, good belief that

9   Massachusetts specifically required it to be in

10  writing.

11      Q.   You say you would have done research, you

12  may have looked at regulations, but you don't know

13  which ones, and whatever it is --

14      A.   I'm saying that I did do that.  I'm saying

15  that I did do that.  My counsel, our compliance

16  department, we do that research.  And if -- if that

17  answer doesn't suffice, I'm not really sure how else

18  I can answer it.

19      Q.   Is there someone else at Monarch who would

20  be more knowledgeable about the reasons why Monarch

21  adopted this belief that disputes in Massachusetts

22  have to be in writing?

23      A.   No.  Myself and our general counsel did

24  that research, and that's it.

25      Q.   Who is the general counsel?



1        A.    Cheryl Cooper.

2        Q.    Is she still with Monarch?

3        A.    Yes, she is.

4        Q.    Let's move on.

5        A.    Excuse me one second.  Can we take a short

6   break?

7        Q.    Sure.  How long do you need?

8        A.    Like two minutes.  Maybe five.

9                    MR. ZELMAN:  Let's come back at

10           11:40.

11                    THE WITNESS:  Sorry.  Thank you.

12                    MR. ZELMAN:  No problem.

13                         - - -

14                    (Whereupon, a brief break was

15           taken at 11:33 a.m. until 11:40 a.m.)

16                         - - -

17   BY MR. ZELMAN:

18        Q.    We were talking about this whole

19   impression you had that Massachusetts state law

20   requires that disputes be in writing, and you had

21   discussed a little bit of the processes by which you

22   had reached that conclusion.  Would any of this be

23   documented anywhere?

24        A.    Yeah.  I can look through my files and see

25   back when we decided to add the "in writing" to



1   Massachusetts.  I might have some information

2   specifically.  We do keep a lot of information, but

3   it would be more notes sort of that went along with

4   the change of the letter or -- if the letter was

5   even changed.  It's been -- you know, prior to more

6   recent changes, that in writing, I'd have to look

7   back to see how long that was in there, you know,

8   how far back my notes go.

9        Q.   Okay.  And that would be connected with

10   that time line for the letter changes that you were

11   referring to earlier?

12        A.   Yeah.

13        Q.   Okay.

14                   Anything else that you might

15   have to look at?

16        A.   I would start there, my notes.

17        Q.   Would you need to talk to Ms. Cooper?

18        A.   Oh, yeah.  Yeah.  She's part of that

19   process.

20        Q.   Now, sitting here today, I believe you

21   said that the letter does not include this "in

22   writing" requirement anymore?

23        A.   For Massachusetts?  I will have to look

24   at -- I'll have to look at the letters as they are

25   today.



DIANE MAZZACANO                                September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

```
1        Q.   That time line you were referring to, is
2   that something that can be printed or is that
3   something that can only be viewed on your internal
4   computer there?
5        A.   Yeah, we -- I have a change log.  It's
6   specific to the change.  So, yeah, I could look to
7   see what I have for that.
8        Q.   What I'm asking is, would it be easier,
9   rather than having you take a break, go and look at
10  it and then try to relay to us what it looks like,
11  to simply print it to a PDF, have your counsel look
12  at it kind of quickly, and then we can all look at
13  it together and you can explain what we're looking
14  at?
15       A.   No.  I don't know that I could do it that
16  way.  I'd have to look -- no.  I think -- I'm
17  thinking about -- it's possible.  I might be able to
18  print something.  Or I could do it -- I mean, if we
19  want to just take this, I can certainly have Ron
20  create a -- like a verification -- not a
21  verification.  Kind of document that I can sign to
22  say that these are the dates and this is what
23  happened.
24       Q.   All right.  I mean, it would be helpful.
25  That's something we can do afterwards, obviously,
```



1    but we don't want to have to come back for another

2    deposition, right?  No one wants to do that.

3                    MR. METCHO:  What are you

4         specifically looking for?  When the language

5         was removed from the letter?

6                    MR. ZELMAN:  Right.  So we

7         referenced the time line for the letter

8         changes, about -- there was different times

9         when the language was in the letter or kind of

10        modified or then removed from the letter.  So

11        we're looking for that time line.  Plus any

12        notes regarding this belief that Massachusetts

13        law requires this language.  And then I guess,

14        finally, which might be tied to the original

15        thing I mentioned, what the letter looks like

16        today.

17                    MR. METCHO:  Why don't you just

18        submit, like, an additional interrogatory and

19        document request?  We can do it that way, too,

20        right?

21                    MR. ZELMAN:  Well, what I'm

22        trying to do is get our deposition done today

23        so there's no concerns so we have to do this

24        again later.

25                    MR. METCHO:  I understand that.



DIANE MAZZACANO                                    September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

```
 1   But I think it's -- knowing Monarch and the
 2   process, it's going to be a time-consuming
 3   process for Diane to obtain that information
 4   and documentation today.  I'm not even sure if
 5   that documentation exists or where it's coming
 6   from or if Ms. Cooper looked at and reviewed
 7   it.  You know, then it's going to be protected
 8   and privileged.  It just seems like a
 9   time-consuming process for today.
10                  MR. ZELMAN:  Okay.  My
11   understanding, just based on what we heard
12   earlier, is that with a couple of minutes at
13   her other computer, Ms. Mazzacano would at
14   least be able to reference that time line.  So
15   if we can do at least that today, I think that
16   would make a lot of sense.
17                  MR. METCHO:  Would you be able
18   to do that today, Diane?
19                  THE WITNESS:  Sure.
20                  MR. METCHO:  So do you want to
21   do it now?
22                  THE WITNESS:  Yeah.  We can take
23   a break now and I can grab it.
24                  MR. METCHO:  Why don't we do
25   that.
```



1                    THE WITNESS:  Wait one second.

2        I'm going to get a pen.

3                    MR. ZELMAN:  Of course.

4                    THE WITNESS:  So you want to

5        know when that T letter in that form, we

6        started using it?

7    BY MR. ZELMAN:

8        Q.   Well, we want to know -- it's more than

9    just started using it.  Because you started using it

10   several years ago, whether it's in 2018 or 2019,

11   you're not certain.  But you started using it.  And

12   then there were some changes made.  So I kind of

13   want to know what those changes were and the dates,

14   basically.

15       A.   Okay.  And then --

16       Q.   Let me know while you're at it, what does

17   the letter look like today.  Does it still have that

18   language in it or does it not have that language in

19   it?

20       A.   Today's Massachusetts version.  Okay.

21   Okay.  We'll start with that.  And do you want to

22   give me -- I don't know -- 15 minutes?

23       Q.   Sure.  We can do this at the end, but then

24   we're just going to come back to it in a line of

25   questioning, so I think it makes sense to do it now.



```
 1         A.    Okay.  Give me 15 minutes.

 2         Q.    Okay.

 3                     MR. METCHO:  Thanks, Diane.

 4                          - - -

 5                     (Whereupon, a brief break was

 6         taken 11:47 a.m. until 12:01 p.m.)

 7                          - - -

 8    BY MR. ZELMAN:

 9         Q.    Ms. Mazzacano, we just took a little break

10    there.  Do you want to tell us what you were able to

11    uncover with that break?

12         A.    Well, what I think is quick, it wasn't

13    quick enough, so I wasn't able to find too much

14    information.  So I might have to -- I just need a

15    little bit more time.  By the time I got my computer

16    up -- the other computer up and running and getting

17    connected, it just -- and some of the files I just

18    don't have access to right now.

19                     But, basically -- sorry, start

20    over.  The letter that is similar to the T letter

21    that is in question, the letter that has the "in

22    writing," if I'm okay to summarize it that way.  We

23    all know what we're talking about.  That was in -- I

24    could go back as far as August of 2018, that that

25    "in writing" was in that first sentence.  It just --
```



1   there was too much information to weed through in a

2   short amount of time, so I couldn't get too much.

3                    But then I jumped to currently,

4   it is not in there.  The "in writing" has been

5   removed.  And right around when it hit 12 o'clock, I

6   was trying to find when that was removed, and that

7   was sometime in 2021.  I just couldn't get the exact

8   date, if that makes sense.

9        Q.   All right.  Were you able to find notes in

10  that time line that you were referring to earlier

11  with regards to what exactly would have caused this

12  impression that Massachusetts state law required

13  this language?

14       A.   No.

15       Q.   I appreciate that.

16                    So you're saying there's more

17  information there, but you'll need time to gather

18  it?  It sounds like that's not something you can do

19  today, correct?

20       A.   Correct.

21       Q.   How much time do you think this will take

22  you to gather this information?

23       A.   I would start with my general counsel, and

24  most likely it's -- not most likely.  It's a hundred

25  percent the work that her and I did together, so I



 1   would start with talking to her.

 2        Q.   Are you saying this is a process that

 3   would take days or weeks or months?  I just want to

 4   try to get a time frame.

 5        A.   I don't know.  I mean, when can I talk to

 6   her?  Days, weeks.

 7        Q.   Great.  So we'll come back to this.  I'll

 8   touch base with your counsel to coordinate the

 9   exchange of this information.  Let's move on.

10                    I'm going to put up a document.

11   I don't think you have it in front of you there, so

12   let me share it with you.  This is a six-page

13   document.  It's entitled Rocke Document Production.

14   This is the discovery production that we received

15   from Monarch in this case.  It's not Bates stamped,

16   so I'm just trying to give it a good description.

17                    Do you see this document,

18   Ms. Mazzacano?

19        A.   Yes.

20        Q.   Great.  I'll label this as Exhibit C.

21                         - - -

22                    (Exhibit C was marked for

23        identification.)

24                         - - -

25   BY MR. ZELMAN:



1      Q.   What is this document that we're looking
2   at, this first page?
3      A.   It's the account history.
4      Q.   And it looks like that continues on to the
5   second page.  So the first two pages are the account
6   history.  And, obviously, that's just a history of
7   this particular account with Monarch?
8      A.   Yes.
9      Q.   All right.  So if you look at the upper
10  right corner, I just had a question about this where
11  it says, AGN, slash, AMT, and then it has a number
12  812.22.  What is that right there?
13     A.   It's the amount of the principal that the
14  client, Premier Bank, sent to Monarch to collect
15  from the consumer.
16     Q.   And underneath that where it says INT,
17  it's another $83.55.  Is that interest?
18     A.   That is interest that the client had
19  accrued before charge off and assigned to Monarch to
20  collect.
21     Q.   Okay.  Here I see it says canceled, and it
22  has both of those figures on different columns
23  there.  What does that tell us?
24     A.   That Monarch is no longer handling the
25  account.



1    Q.   Okay.  So just going back to that interest

2    thing for a second.  You said this is interest that

3    accrued before charge off?

4    A.   Correct.

5    Q.   So just so I understand.  This is not

6    interest that was accrued while my client was using

7    the account and then if you don't pay your payment

8    on time, you get interest added to your balance when

9    you use a credit card, that kind of thing?  This is

10   not that kind of interest, correct?

11   A.   That interest you'd have to, I guess, ask

12   the client.  I don't know how the client accrues

13   that interest.  All I know is that it is broken out

14   so that the consumer -- so when the consumer

15   contacts us, you know, it can be discussed.  The

16   client gave us the breakout.  I don't know what they

17   did with that, how that 83 came about, but that is

18   part of the balance that the client assigned to

19   Monarch to collect.

20   Q.   Sure.

21                  Now, do you get any sort of

22   documentation from the client when they assign you

23   an account to collect?

24   A.   We get the basic information that you see

25   there; the demographic information, the consumer's



1  name, Social Security number, phone numbers, and the

2  principal and the interest that they want us to

3  collect.

4      Q.   Sure.

5              What I'm asking is, you don't

6  get like the monthly statements or anything like

7  that?

8      A.   No.  If the consumer disputes the balance,

9  we would let First Premier Bank know that, and this

10 particular client would then directly send the

11 disputed documentation, debt validation, things like

12 that to the consumer.

13     Q.   All right.  So you see these dates over

14 here -- I don't know if you can see what I'm

15 highlighting here.

16     A.   I see.

17     Q.   Can you see that?

18     A.   Um-hmm.

19     Q.   Great.  I don't know if that comes over on

20 your side.

21              So I highlighted three lines.

22 The first one says, The last account -- and it has a

23 date of 9/27/20.  What is that?

24     A.   Last action.

25     Q.   Oh.  Last action.  I'm sorry.



1    A.   That's okay.  That's the last time -- I

2    think if you scroll down in the note lines, you can

3    see.  Maybe that was when the account was closed or

4    the last action that Monarch touched the account.

5    Q.   Okay.

6    A.   The last time that Monarch touched the

7    account.

8    Q.   Below that there's a line that says CLLC,

9    slash, LP with a date beside that.  What is that?

10   A.   That is the last payment date that the

11   client, Premier Bank, gave to Monarch as the last

12   payment date.

13   Q.   Okay.  And then is that an interest

14   effective date below that?

15   A.   Yes.  Yes.

16   Q.   And what is that?

17   A.   That is -- I guess it's kind of

18   misleading.  But that will always match the date

19   that we added the interest to the account from the

20   client.  So that just shows that -- if you look at

21   the first note line, the account was loaded to the

22   system on 4/11/19.  So that's always going to match

23   that date, because that's the date that we put that

24   amount in that field.

25   Q.   Okay.  I understand.



DIANE MAZZACANO                                    September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

1      A.   But we don't accrue interest or apply

2  interest or fees to any account.  So it's just a

3  field that lets us know when we've loaded that field

4  to the -- that data in that field.

5      Q.   All right.  So to clarify, you do attempt

6  to collect interest, which we see is $83.55, but

7  then you don't continue to accrue additional

8  interest once it's assigned to your company,

9  correct?

10     A.   Correct.

11     Q.   All right.  Great.  We can take this off

12 now.  We're almost done.

13              The other thing I wanted to just

14 ask you about are these financial statements.

15     A.   Sure.

16     Q.   I don't want to skip ahead.  One second.

17              So we have some financial

18 statements that were produced in this action for the

19 years ending December 31, 2020 and 2019.  Have you

20 looked over those financial statements in advance of

21 today's depositions?

22     A.   Not recently, but they're my company's

23 financials.  I'm familiar with them.

24     Q.   Sure.

25              As part of this, we have a



1  balance sheet for the year end for both of those

2  years, 2020 and 2019.  Do you have a balance sheet

3  that's more recent than December 31 of 2020?

4       A.   Not a reviewed one, but we have internals,

5  yes.

6       Q.   So when you say "a reviewed one," this

7  appears to have been reviewed by an accounting firm,

8  Morrison Cogan(ph)?

9       A.   Correct.

10      Q.   But the non-reviewed ones are just

11  maintained by your company, but haven't been

12  reviewed by an outside auditing company?

13      A.   Correct.  They're also not the official --

14  you know, our official financials are our yearends

15  that accountants then go in and do their auditing

16  and -- but they don't change that much from that.

17  But they're internals, not reviewed.

18      Q.   Okay.  And I don't want to spend a whole

19  lot of time on this, but let me pull up what I have

20  here.  Share screen.

21                  You should see the balance sheet

22  in front of you.

23      A.   Yes.

24      Q.   Okay.  So as I read it, at the end of

25  2019, there was a net worth of just assets minus



1    liabilities of about ████, and at the end of

2    2020, that was around ████, correct?

3         A.   Yup.

4         Q.   Do you know how it stands today?

5         A.   I don't know the exact number today.  It's

6    a little bit higher. ████████████████████████

████████████████████████████████████████████████

████████████████.

9         Q.   Okay.  When do you expect that those

10   balance sheets would be ready?  Obviously, I know

11   you have them prepared at the end of the year.

12   Typically, when is that back from your accounting

13   firm or whatever?

14        A.   At the latest, mid-March each year.

15        Q.   Okay.  Now, does this balance sheet also

16   reflect incoming payments as well or does it just

17   reflect, like, the cash received in the bank?  And

18   let me know -- I'm skipping a couple of steps

19   talking about accounts receivables and how you guys

20   track monies that have been earned by Monarch.  I

21   can do that step by step, if you don't understand my

22   question.

23        A.   No.  I don't understand -- they're our

24   company financials.  It encompasses everything.  We

25   follow GAAP accounting principles, just like any



1    normal corporation.

2        Q.   No, I understand.  So let me ask it this

3    way.  It will get us out quicker and we'll be out in

4    a couple of minutes.

5                    How does Monarch account for

6    payments it receives?  So are you accounting for

7    when, for example, money is actually received from a

8    debtor, or is it when money is received from your

9    client?  How does --

10       A.   Oh.  You're talking about our revenue, how

11   we're booking revenue?

12       Q.   Yes.

13       A.   It's the month that it's earned.  So when

14   we get a payment from a consumer in January, that

15   revenue that we earned is January revenue.  It

16   doesn't matter when the client actually pays us.

17   It's earned when it was earned.

18       Q.   So, for example, you reach out to a

19   debtor, they agree to pay you.  Do you take that

20   money -- take off whatever percentage you're sending

21   to your client and keep the rest, or do you send it

22   all to your client and then --

23                    MR. METCHO:  I'm going to object

24        to this line of questioning.  This has

25        absolutely nothing to do with their net worth



DIANE MAZZACANO                                    September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

1        or any kind of class information or the

2        allegations of the complaint.  I'm really not

3        sure where you're going with this.

4                    MR. ZELMAN:  I have no reason to

5        ask the questions other than to determine that

6        the balance sheet we're looking at accurately

7        reflects the net worth of the company.  I have

8        no other use for this information.

9                    THE WITNESS:  They're audited by

10       a CPA -- a CPA firm.  And we follow GAAP

11       accounting principles.  So it would absolutely

12       accurately reflect the revenue of the company

13       and the net worth.

14   BY MR. ZELMAN:

15       Q.   I get it.  And the fact that it is audited

16   by an outside accounting firm is the reason why I

17   don't intend to spend like 45 minutes going over

18   these documents.  For the most part, I'm going to

19   take their word for it.  I'm just addressing a

20   couple of quick questions based upon how incoming

21   money is accounted for, just to make sure that this

22   does, in fact, accurately reflect the net worth of

23   the company.  That's all.

24       A.   I think the accountants would, you know,

25   and our controller and our company -- it's just



1  funny, I guess, but anyway.  But, yeah, it's when

2  it's earned.  Just exactly how GAAP requires us to

3  do.

4       Q.   Understood.

5                 Again, my question is, a debtor

6  pays you because, you know, he agrees to pay his

7  debt and he sends you a hundred dollars.

8       A.   Right.

9       Q.   Do you take that hundred dollars and send

10  a certain amount of it, let's say, $70 off to your

11  client, or do you send them the full hundred dollars

12  and wait for them to pay you?

13                 MR. METCHO:  I'm going to

14       object.  What does it have to do with anything?

15       How is this relevant to the current litigation?

16                 MR. ZELMAN:  Net worth.  That's

17       what we're here for.

18                 MR. METCHO:  It's right there on

19       an audited financial statement.

20                 MR. ZELMAN:  I understand.  And

21       I am giving it the weight it deserves, because

22       it is an audited financial statement.  It is

23       three questions that I have that I have no

24       other use for and I will not share with anyone

25       else.



DIANE MAZZACANO                                                 September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

```
 1                    MR. METCHO:  Okay.
 2                    MR. ZELMAN:  Just to make sure
 3        we're good here.  That's it.
 4                    MR. METCHO:  Okay.  You can
 5        answer, Diane, if you're able.
 6                    THE WITNESS:  Both.  It just
 7        depends on what the client wants us to do.
 8        Contractually -- it's determined contractually
 9        by the client, whether they're gross or net.
10   BY MR. ZELMAN:
11        Q.   Sure.
12        A.   But it doesn't matter.  It doesn't matter
13   whether -- it has no bearing on when the client pays
14   us.  It doesn't matter.  The revenue is earned the
15   minute we receive the payment and post it to the
16   account.  That is revenue earned.  And that is the
17   month -- it doesn't matter.  The client could take
18   six months to actually cash pay us.  That's a cash
19   transaction.  It has nothing to do with your
20   revenue.  Your revenue is earned the second that you
21   get the money from the consumer, and you post it to
22   that account.  That commission is calculated.
23   Whether we get it right now or in six months, it is
24   earned right there.
25        Q.   I understand.  Okay.  That clears up a
```



1  whole lot of it.  I appreciate that.

2                     Now, if a consumer makes a

3  promise to pay, so they're on a payment plan or

4  something like that, do you book that in the revenue

5  or you only put it once it's received?

6       A.   You are not allowed to book money that you

7  did not actually get, so no.

8       Q.   Sure.

9       A.   You're not -- you're actually not allowed

10  to do that.  A corporation is not allowed to book

11  money that they didn't actually receive.  That would

12  be, I think -- yeah.  No, you can't do that.

13  Massachusetts doesn't allow you to do that either.

14       Q.   All right.  I was just checking.

15                     Do you have some sort of idea

16  about the amount of money that is owed to Monarch

17  that is not reflected on the balance sheet?  Is that

18  a number you track?

19       A.   Yeah.  It's right on the balance sheet.

20       Q.   Is that under the accounts receivable?  Is

21  that what you're referring to?

22       A.   Yeah.  It shows on the balance sheet

23  under -- I think it's -- restricted cash is cash

24  that we have that we have not paid to our client

25  yet.  But accounts receivable.

1                        But, anyway, this is -- you're

2       talking currently?  I'm sorry.  You're throwing

3       me -- what was the question?

4                        Does our accounting department

5       have a way to determine cash that has not yet been

6       paid to us?  Yes, of course.

7              Q.   Right.  Is that a number you track?  Are

8       you familiar with what that number is?

9              A.   Yes.  I'm familiar with it.

10             Q.   Sure.

11                       Can you give us an idea of what

12      we're talking about there?

13             A.   Today?  Right now?

14             Q.   To the best of your knowledge.

15             A.   No.  No, I do not know how much money our

16      clients owe us today.

17             Q.   Okay.  What is that general number?

18             A.   But what would that -- I guess I'm

19      confused as to -- you're talking about cash.  The

20      commission earned was already booked, so what does

21      it matter when the cash is coming in?  It wouldn't

22      matter.  It's already booked.

23             Q.   Well, that's what I'm asking.

24             A.   Yeah.  No.  I said that.  When we -- when

25      we -- the day that we get a payment from a consumer,



 1 | our portion of that is earned already.  It's earned
 2 | commission.  It's already in the books.  It goes in
 3 | the books immediately.  It doesn't matter when they
 4 | actually paid us.
 5 |                     MR. METCHO:  Whatever hasn't
 6 |      been paid is listed under your accounts
 7 |      receivable under assets, right?
 8 |                     THE WITNESS:  Yup.
 9 |                     MR. ZELMAN:  Then that's what I
10 |      was asking.  I just wanted to make sure it's
11 |      reflected in there.
12 | BY MR. ZELMAN:
13 |      Q.   Finally, my last question with this sheet
14 | here is, the due to related parties, you have a half
15 | a million dollars under liabilities that are due to
16 | related parties.  Can you explain what that is?
17 |      A.   In 2020, the end of 2020, due to related
18 | parties, I believe that is a loan payment to our
19 | holding company.
20 |      Q.   Okay.  Who's the holding company?
21 |      A.   Monarch Recovery Holdings.
22 |      Q.   Sure.
23 |                     Is that also owned by you?
24 |      A.   Yes.
25 |      Q.   Okay.  So can you explain what half of a



1  million dollars is being paid to the holding company

2  for?

3       A.   Yeah.  It's just a pass through.  It's a

4  loan.  Just a loan that the company took out.  The

5  holding company took the loan out.  So the money

6  goes -- to pay that loan, you can't pay it directly.

7  So the money goes to the holding company.  The

8  holding company makes the loan payment.

9       Q.   Okay.

10      A.   And that's the balance of the loan.

11      Q.   Is that paid off at this point?

12                  MR. METCHO:  Objection.  What's

13           the relevance of this at this point?  I'm not

14           trying to give you a hard time.  I'm just not

15           understanding some of these questions about the

16           financial background, other than what their

17           current net worth is, which is the information

18           you need for your potential class

19           certification.

20                  MR. ZELMAN:  Sure.  We have a

21           due to related parties of about thirty-five

22           hundred in 2019.  That jumps to half a million

23           dollars in 2020.  And that's the financials

24           that we're looking at now.  And my question is,

25           is that going to be impacting the net worth for



1      2021 or is that now done?  I don't know what

2      that payment is.  I don't know what is still

3      expected to be paid, if anything.

4                    THE WITNESS:  Well, you had --

5      I'm sorry, Ron.

6                    MR. METCHO:  No, go ahead.  You

7      can answer.  That's fine.

8                    THE WITNESS:  No, no.  I was

9      just -- you had asked if we could supply -- I

10     think you asked if we could supply a more

11     recent balance sheet, and the answer to that is

12     yes.  So wouldn't that be -- I mean, if this

13     continues on and if this case continues, at

14     some point you are going to have a new balance

15     sheet.  I mean, we're looking at something from

16     2020.  Right?  I mean, you need a new balance

17     sheet anyway, so -- and I don't know what it

18     looks like today off the top of my head, so --

19     but it will be what it is.

20  BY MR. ZELMAN:

21     Q.   I understand.  I didn't know if that's

22  something that's a one-time thing or if there's more

23  payments and, therefore, it's going to be reflected

24  there or not.

25     A.   No.  You'll probably see that -- the due



1   to related parties, you'll see that again.  I don't

2   know what the figures are.  But in the end, the

3   balance sheet will be what the balance sheet is.

4        Q.   Understood.  All right.  Let me see if I

5   had anything left for you.  Give me a second.

6                  So other than the information

7   earlier that we're seeking, just any more

8   information that can be shared regarding the time

9   line or any of the notes with regards to that time

10  line or of Monarch's belief that Massachusetts state

11  law required this "in writing" language, I have no

12  further questions for this witness.

13                  MR. ZELMAN:  Ron, are you going

14       to ask any questions of this witness?

15                  MR. METCHO:  I have no further

16       questions.

17                  MR. ZELMAN:  Then you're free to

18       go, Ms. Mazzacano.  We appreciate your time

19       here today.

20                  THE WITNESS:  Sure.  Thank you.

21                  THE COURT REPORTER:  Ron, did

22       you want Diane to read and sign?

23                  MR. METCHO:  Not at this time,

24       but I'll let you know.  I'll take your e-mail

25       address down so if I need it.



 1                    THE COURT REPORTER:  Okay.  So,
 2    no read and sign and no copy order?
 3                    MR. METCHO:  Actually, yeah, I'm
 4    going to need a copy to do it any way, because
 5    Diane's going to need to read it and confirm
 6    it, so I'll take a copy, a condensed copy.
 7                    THE COURT REPORTER:  Mr. Zelman,
 8    did you want to have this transcribed?
 9                    MR. ZELMAN:  Yes.  I'll take an
10    electronic version.
11                         - - -
12                    (Whereupon, the Zoom Deposition
13    concluded at or about 12:27 p.m.)
14                         - - -
15
16
17
18
19
20
21
22
23
24
25



DIANE MAZZACANO                                        September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

```
1                      C E R T I F I C A T I O N

2

3

4            I hereby certify that the proceedings and evidence

5    are contained fully and accurately in the stenographic

6    notes taken by me upon the foregoing matter on September

7    10, 2021, and that this is a correct transcript of the

8    same.

9

10

11

12                          Jennifer Mann
                            Court Reporter-Notary Public

13

14

15

16            (The foregoing certification of this transcript

17   does not apply to any reproduction of the same by any

18   means, unless under the direct control and/or supervision

19   of the certifying reporter.)

20

21

22   Subscribed and sworn to before me this _____

23   day of  _____, 20_____.

24   My commission expires:  6/14/2025

25
```



DIANE MAZZACANO                                    September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

```
 1                    DEPOSITION ERRATA SHEET

 2

 3         Our Assignment No.  J7390153

 4         Case Caption:   SHERWYIN ROCKE, INDIVIDUALLY AND ON

 5    BEHALF OF ALL OTHERS SIMILARLY SITUATED

 6                         Vs.

 7                         MONARCH RECOVERY MANAGEMENT,

 8         INC.

 9

10

11         DECLARATION UNDER PENALTY OF PERJURY

12

13            I, DIANE MAZZACANO, declare under penalty of

14    perjury that I have read the entire transcript of

15    my Deposition taken in the captioned matter or the same

16    has been read to me, and the same is true and accurate,

17    save and except for changes and/or corrections, if any, as

18    indicated by me on the DEPOSITION ERRATA SHEET hereof,

19    with the understanding that I offer these changes as if

20    still under oath.

21

22    Signed on the _____ day of_____, 20___.

23

24    _____
      Witness Name
25
```



DIANE MAZZACANO                                    September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

1                    DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   _____

21

22

23     SIGNATURE:_____DATE:_____
                    Witness Name
24

25



DIANE MAZZACANO                                    September 10, 2021
ROCKE vs MONARCH RECOVERY MANAGEMENT

1                    DEPOSITION ERRATA SHEET

2

3   Page No._____Line No._____Change to:_____

4   _____

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7   _____

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24      SIGNATURE:_____DATE:_____
                    Witness Name
25

